UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America ex rel. Christopher Kremers, State of Minnesota ex rel. Christopher Kremers,<br><br>　　　　　　　　　　Relator,<br>v.<br><br>TEAM Industrial Services, Inc.<br><br>　　　　　　　　　　Defendant. | Court File No. _____<br><br>**FILED IN CAMERA AND MUST REMAIN UNDER SEAL FOR AT LEAST 60 DAYS PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**COMPLAINT AND JURY DEMAND** |

Comes now Relator Christopher Kremers on his own behalf and on behalf of the United States of America, by and through his attorneys, against the above-named Defendant pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, and moves the Honorable Court for judgment against Defendant as follows:

**I.　JURISDICTION & VENUE**

1.　This is a civil action arising under the laws of the United States of America to redress violations of federal acts; therefore, this Court has subject matter jurisdiction over this Complaint pursuant to 28 U.S.C. § 1331.

2.　This Court has personal jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) of the False Claims Act, which provides that a *qui tam* action may be brought in any judicial district in which the Defendant can be found, resides, transacts business, or in which any act proscribed by § 3729 *et seq.* occurred.

3.    Venue in the District of Minnesota is proper under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 (b) and (c) because Defendant transacted business in the District of Minnesota and committed acts proscribed by 31 U.S.C. § 3729 *et seq.*

4.    The causes of action alleged herein are timely brought because of Defendant's wrongdoing is ongoing or has occurred within the past six (6) years.

## II.   PARTIES & BACKGROUND

5.    Relator Christopher Kremers ("Relator") is a citizen of the United States, who resides in St. Cloud, Minnesota. Relator worked for Defendant TEAM Industrial Services, Inc. ("Defendant" or "TEAM") from November 2015 to April 2017.

6.    While employed by Defendant, Relator witnessed Defendant fraudulently certify to numerous manufacturers, that maintained contracts with the United States Government, that it had conducted Non-Destructive Testing on different parts and materials in accordance with various standards.

7.    Those fraudulent certifications were material to payment by the United States Government and are the basis for this *qui tam* action pursuant to the False Claims Act, as explained in more detail below.

8.    Defendant is a Texas corporation licensed and conducting business in the State of Minnesota. Defendant is a publicly traded company that provides maintenance, inspection, and testing services for part, materials, and components utilized in a variety of industries. Defendant provides inspection services for parts manufactured by Boeing, Orbital/ATK, Brenk, and McNally Industries, to name a few.

## III. THE UNITED STATES FALSE CLAIMS ACT

9. The FCA provides, in part, that any person who "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval …" or "(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a fraudulent claim … is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 … plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)

10. Relator has direct and independent knowledge that Defendant has knowingly made or caused to be made false or fraudulent claims to the United States Government.

11. Relator has direct and independent knowledge that Defendant knowingly caused to be made or used a false record or statement material to a fraudulent claim.

12. Relator seeks to recover damages and civil penalties arising from Defendant's role in the submission of fraudulent claims to the United States Government in exchange for payment for military and other equipment that was not tested according to the material certifications.

## IV. BACKGROUND & FACTS

### A. Non-Destructive Testing

13. One of the services Defendant offers to its customers is Non-Destructive Testing ("NDT").

14. NDT is the process of inspecting or evaluating parts or materials for deficiencies, discontinuities, or differences in characteristics for the purpose of validating

the integrity of the materials, identifying irregularities, and recognizing defective components.

15. NDT is performed in such a way that the serviceability or functionality of the part or materials tested remains intact and can still be used.

16. For example, magnetic particle testing is a method of NDT that is used to detect cracks, laps, seams, inclusions, and other discontinuities on or near the surface of ferromagnetic materials such as iron, nickel, and cobalt. This is considered NDT because it uses a magnetic field to evaluate the properties of a component without permanently altering the article being inspected.

**B. Defendant's Contracts with manufacturers for NDT and General Overview of the Testing Process**

17. Defendant contracts with companies to provide NDT—and specifically, magnetic particle testing—of different parts and materials the companies manufacturer.

18. The companies Defendant contracts with include, but are not limited to: Precise Products, Orbital/ATK, Brenk, Boeing, Honeywell, and McNally Industries (herein after referred to as "manufacturers").

19. Defendant's employees, called technicians, conduct magnetic particle testing according to specific standards, which differ based on the part or material being tested.

20. If the part or material tested meets the acceptance criteria for use specified by the Manufacturer, Defendant completes a Certificate of Inspection.

21. Each Certificate of Inspection lists the alleged testing method used, specification, procedure, and acceptance criteria for each part or material tested, and is signed by a Level III Technician, attesting to the same.

22. Defendant sends the Certificates of Inspection, along with the part or materials inspected, back to the Manufacturer following the testing.

23. Defendant is aware that the United State Government is the ultimate purchaser of many of the parts and materials that are certified to have undergone NDT and meet acceptance criteria for use.

24. For example, Relator has personally observed paperwork titled "Purchase Order Attachment, Government Orders Only," in Defendant's aerospace lab that demonstrates Defendant has a contract with Honeywell for NDT of parts that are connected to a government contract.

25. Upon information and belief, the United States Government conditions payment to manufacturers on the understanding that the materials provided have undergone NDT and passed inspection.

**C. Relator's Employment with Defendant and Observations of Fraudulent Certifications**

26. Relator began his employment with Defendant in November 2015, shortly after he received his certification in NDT.

27. Relator was a Level I Technician. As a Level I Technician, Relator operated magnetic particle testing equipment under the direction of a Level II or Level III Technician, but could not sign off on any paperwork.

5

28. During the first several months of his employment, Relator worked at different locations around the five-state area performing NDT.

29. In or around May 2016, Relator reported several safety and timekeeping violations to his supervisor and human resources.

30. Within a few days, Defendant removed Relator from field jobs and reduced him to working in Defendant's aerospace lab in Roseville, Minnesota.

31. There, Relator and other technicians conducted NDT on various parts and materials in a lab.

32. From May to July 2016, while Relator was working at the aerospace lab, he repeatedly observed a disturbing pattern.

33. On numerous occasions, he watched Defendant's technicians knowingly bypass NDT testing requirements and complete only minimal magnetic particle testing. Most frequently, he observed technicians testing parts only one directional way, when the magnetic particle testing standards require testing two directional ways, meaning at two different angles and at two different amperages.

34. Relator witnessed a TEAM Technician perform incomplete or incorrect testing on parts and materials on the following dates:

   a. January 6, 2016 on Precise Products Part No. 2160-0293-1, tested at the aerospace lab in Roseville, MN;

   b. January 28, 2016 on Precise Products Part No. 2155-0267-1, tested in the aerospace lab in Roseville, MN;

c. May 13, 2016 on Precise Products Part No. 2155-0241-1 and Brenk Part No. 251A2175;

d. May 16, 2016 on Precise Products, Part Name: Gland, Merit Gage Part No. 29229 and Brenk, Part No. 251A2175;

e. May 19, 2016 on Timron Precision Gear, Part No. 4135-131-1;

f. May 23, 2016 on Precise Products Part Nos. 2155-0278-2 and 6092-0216-03;

g. May 25, 2016 on Timron Part Nos. 03-1091-001 and 00-887756;

h. May 26, 2016 on Tolerance Masters Part No. 1718082;

i. June 2, 2016 on Timron Part No. 262541-001;

j. June 3, 2016 on Precise Products Part No. 2155-0204-1;

k. June 6, 2016 on MicroFab Part No. 77FV600-1;

l. June 13, 2015 on Modern Manufacturing Part No. 8924569002-1;

m. June 21, 2016 on J and E Precision Part No. 2145-0222-2, and Nelson Numeric, Part No. 3861151-1;

n. June 27, 2016 on J and E Precision Part No. 657920, Brenk Part No. 251A2176-1, and Microfab Part No. 77FV600-1;

o. June 28, 2016 on Fast Craft LLC Part No. PDM60L1-2AA-3;

p. June 29, 2016 on McNally M242 Bolt, Part No. 465-4332 Rev B and Timron Precision Gear, Part No. AFH010813 (the McNally bolt certificate is dated June 30, 2016);

q. July 8, 2016 on Timron Precision Gear Part No. 1029D112-1; and

r. July 13, 2016 on Timron Precision Gear Part No. 02313-0532-0002W.

35. Despite the substandard testing, Defendant's Level III Technicians signed Certificates of Inspection, certifying Defendant had conducted the magnetic particle testing according to the standards and procedures specified and that the parts or materials met the acceptance criteria identified therein.

36. It was, and may still be, Defendant's practice to send the fraudulent Certificates of Inspection back to the respective Manufacturer, along with the parts or materials allegedly inspected.

37. As described above, the Manufacturer then sent the parts and the fraudulent certifications to various governmental agencies and organizations, including the United States Department of Defense, for use in government machines and equipment.

38. Upon information and belief, the government remits payment to the manufacturers for the parts, with the understanding based on the Certificates of Inspection, that the parts have passed NDT inspection and do not contain defects warranting non-acceptance.

39. Relator is aware of this government involvement because on or around May 18, 2016, Relator observed one of Defendant's technicians conducting magnetic particle testing on ITW Heartland Part Number D9407.

40. Relator observed that the Purchase Order for Part Number D9407 identifies a government contract number and a government priority rating of DO-AI, both which are associated with the Part. DO-A1 is a priority rating connected to the United States Department of Defense.

41. According to the standard practices for the testing of Part Number D9407, these materials must be tested two directional ways. However, Relator observed the testing technician conduct only the CBC method of testing (one directional way).

42. Despite this, one of Defendant's Level III technicians then signed off on a Certificate of Inspection, certifying all of the D9407 parts had been tested two directional ways.

43. Defendant sent the parts, along with the Certificate of Inspection, back to ITW Heartland/Honeywell.

44. Upon information and belief, the United States Department of Defense remitted payment to ITW Heartland/Honeywell for the D9407 parts. The remittance of payment to ITW Heartland/Honeywell was conditioned on the Certificate of Inspection, certifying the parts had undergone complete NDT.

45. Upon information and belief, ITW Heartland/Honeywell in turn remitted payment to Defendant for the fraudulent NDT inspection.

46. Relator observed this same practice occur over and over during his time in the Roseville, Minnesota aerospace lab.

47. Other employees of Defendant are also aware of the substandard testing.

48. On July 7, 2016, Relator asked one of his coworkers why he hadn't tested a part two-directional ways when that was required. In response, the technician told Relator, "Dude … if we tested every part in both directions … we would never get anything done … especially that little shit." The technician then admitted that Brandon Giesen and Dave Kubes knew technicians did not perform magnetic particle testing in two directional ways

as is required. Mr. Giesen and Mr. Kubes are Level III technicians who sign the Certificates of Inspections verifying the inspections have been conducted in accordance with the method, specifications, procedures, and acceptance criteria listened therein.

49.  In July 2016, Relator was involved in an automobile accident, unrelated to his employment with Defendant.

50.  As a result of the accident, Relator suffered injuries and was out of work for most of the summer and fall 2016.

51.  On or about October 14, 2016, Relator mailed a letter to Human Resources Representative, Douglas Frankhouser, and Operations Manager, Rick Meyer.

52.  In the letter, Relator reported the fraudulent certifications he had observed. Specifically, he wrote:

> I have repeatedly observed numerous TEAM employees falsely certify to companies like ATK and Boeing (to name just two), that parts have been tested according to standard and specifications, when in reality they have not been tested properly and shortcuts have been taken. I know many of these parts are ultimately sent to government organizations and thus, not only is TEAM falsely certifying to manufacturers, it is also falsely certifying parts to the U.S. Government. I have become alarmed and disgusted with the refusals and failures to do testing correctly. The parts or welds we are certifying as being tested correctly per standards, specifications and acceptance criteria can be critical for the safety and even lives of many people, including our American Military.

53.  On or about December 2, 2016, Mr. Frankhouser and TEAM attorney, Lee Johnson, told Relator the company was investigating his October 2016 report and the fraudulent certifications.

54.  Relator is unaware of any action Defendant took to redress the fraud.

55. On or about January 16, 2017, Mr. Meyer told Relator Defendant was laying him off, reasoning it could not accommodate his work restrictions related to the July 2016 accident because it allegedly had no light duty work for him.

56. Defendant did not call Relator back to work. Relator has since learned Defendant terminated him as of April 17, 2017.

COUNT I
VIOLATIONS OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(A):
PRESENTMENT OF FALSE CLAIMS

Relator re-alleges all preceding paragraphs of this Complaint.

57. Defendant knowingly, in reckless disregard and/or with deliberate ignorance of the truth or falsity of the information involved, presented, or caused to be presented, and may still be presenting or causing to be presented, to the United States Government false or fraudulent claims for payment, in violation of, *inter alia*, 31 U.S.C. § 3729(a)(1).

58. Defendant knowingly caused to be presented false or fraudulent claims for payment to the United States Government by certifying it had conducted NDT in accordance with standards approved by the United States Government, when in reality, Defendant did not completely and properly conduct the NDT.

59. Had the United States Government been aware of Defendant's illegal and improper conduct in violation of the False Claims Act, Defendant would not have been reimbursed for its services.

60. As a direct and proximate result of Defendant's fraudulent conduct, as described above, the United States Government sustained economic damages in an amount to be calculated and proven at trial.

## COUNT II
### VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(B): USE OF FALSE RECORD

Relator re-alleges all preceding paragraphs of this Complaint.

61. Defendant knowingly, in reckless disregard, or with deliberate ignorance of the truth or falsity of the information involved, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records and/or statements, which are material to a false or fraudulent claims in violation of, *inter alia*, § 3729(a)(1)(B).

62. Defendant has knowingly caused manufacturers to submit bills to the United States Government as a result of receiving the fraudulent Certificates of Inspection from Defendant.

63. Had the United States Government been aware of Defendant's illegal and improper conduct in violation of the False Claims Act, Defendant would not have been reimbursed for its services.

64. As a direct and proximate result of Defendant's fraudulent conduct, as described above, the United States Government sustained significant economic damages in an amount to be calculated and proven at trial.

### PRAYER FOR RELIEF

Therefore, Plaintiff requests that judgment be entered against Defendant for the following:

   a. That Defendant be ordered to cease and desist from submitting any additional false claims, or further violations of 31 U.S.C. § 3729.

   b. That judgment be entered in Relator's favor and against Defendant in the amount of each and every false or fraudulent claim, multiplied as provided by 31 U.S.C. § 3729(a), plus a civil penalty of not less than Five Thousand, Five Hundred Dollars ($5,500.00) or more than Ten Thousand Dollars ($10,000) per false claim, as provided by 31 U.S.C. § 3729(a), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery.

   c. That relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

   d. That judgment be granted for Relator against Defendant for all costs, including, but not limited to, court costs, expert fees, and all attorneys' fees incurred by Relator in the prosecution of this suit; and

   e. That Relator be granted such other and further relief as the Court deems just and proper.

RELATOR DEMANDS TRIAL BY JURY ON ALL COUNTS WHERE TRIAL BY JURY IS AVAILABLE.

Dated: August 24, 2017							s/ Christopher D. Jozwiak
Christopher D. Jozwiak
Bar No. 0386797
Shawn J. Wanta
Bar No. 389164
Cassie C. Navarro
Bar No. 0396376
*Attorneys for Plaintiff*
BAILLON THOME JOZWIAK & WANTA LLP
100 South Fifth Street, Suite 1200
Minneapolis, MN 55402
Telephone: (612) 252-3570
Fax: (612) 252-3571
cjozwiak@baillonthome.com
swanta@baillonthome.com
cnavarro@baillonthome.com